**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| *for the use and benefit of Tusco, Inc., et al.,* | * | |
| | * | |
| Plaintiffs, | * | Civil No.   **PJM 15-2885** |
| | * | |
| v. | * | |
| | * | |
| **CLARK CONSTRUCTION** | * | |
| **GROUP, LLC,** *et al.*, | * | |
| | * | |
| Defendants. | * | |

**<u>MEMORANDUM OPINION</u>**

The United States of America, for the use and benefit of Tusco, Inc., and Tusco, Inc. in its own capacity (collectively "Tusco") have sued Clark Construction Group, LLC ("Clark") and Travelers Casualty and Surety Company of America ("Travelers") (collectively "Defendants") based on a dispute over work Tusco performed on a federal construction project. Tusco, a subcontractor on the project, alleges that Clark, the prime contractor, failed to timely pay it for certain change order work performed by Tusco at Clark's request. Tusco's claims include breach of contract against Clark (Count I); quantum meruit against Clark (Count II); and breach of payment bond in violation of the Miller Act, 40 U.S.C. § 3133, against Travelers. Clark has moved to dismiss Counts I and II, and Travelers has moved to stay Count III.[1] For the reasons that follow, the Court will **DENY** Clark's Motion to Dismiss (ECF No. 7) and **DENY** Travelers' Motion to Stay (ECF No. 7).

---

[1] To the extent Counts I and II are not dismissed, Clark has also moved to stay these claims. *See* Defs.' Mot. Dismiss and Stay. As will be explained *infra*, Clark's (Alternative) Motion to Stay these Counts will also be **DENIED**.

# I. FACTS AND PROCEDURAL HISTORY[2]

On or about September 27, 2011, Clark contracted with the United States (the "Prime Contract") to provide construction services with respect to a federal project located in Bethesda, Maryland, known as the Intelligence Community Campus-B (ICC-B) North Campus (the "Project"). Compl. ¶ 7, ECF No. 1. On September 28, 2011, Clark secured a payment bond (the "Bond") from Travelers Casualty and Surety Company with a penal sum of $39,912,000.00. *Id.* ¶ 8. Under the terms of the Bond, Travelers agreed to be bound jointly and severally with Clark to make payment to all persons having a direct contractual relationship with Clark or to any of Clark's subcontractors who furnished labor, material, or both in performing the work for the Prime Contract in the event Clark failed to make prompt payment. *Id.*; Compl., Ex. A, ECF No. 1-1.

## A. The Subcontract

On or about January 16, 2012, Clark entered into a subcontract with Tusco[3] (the "Subcontract") to furnish labor, materials, equipment, and all other items necessary to complete Tusco's work for the Project. Compl. ¶ 9; Compl., Ex. B, ECF No. 1-2. Under the Subcontract, Clark agreed to pay Tusco $615,000.00 for the work. Compl. ¶ 10; Compl., Ex. B, Art. 4(a). The Subcontract contained a provision making payment to Clark by the Government (referred to in the Subcontract as the "Owner") a condition precedent to Clark's payment to Tusco. Specifically, Article 4(j) of the Subcontract provided, in part:

> Subcontractor agrees that payment by the Owner to Clark for work performed by the Subcontractor . . . is a condition precedent to any payment obligation of Clark to Subcontractor. Subcontractor agrees that the liability of Clark's sureties on any bond for

---

[2] Unless otherwise noted, the facts are as alleged in the Complaint or the exhibits attached to it, *see* Fed. R. Civ. P. 10(c).

[3] Counsel for Tusco indicated that Tusco is a perimeter security and commercial fencing company during the March 29, 2016 Motions Hearing.

payment to Subcontractor is subject to the same conditions precedent as are applicable to Clark's liability to Subcontractor.

Compl., Ex. B, Art. 4(j).

In addition to setting forth these payment procedures, the Subcontract contained several clauses governing "changes" in the scope of Tusco's work under the Project. In general, the Subcontract permitted Clark to order such changes unilaterally and without notice, provided that it notified Tusco of the changes in writing.[4] *Id.*, Art. 9(a). If Tusco claimed entitlement to additional compensation for such work (beyond the $615,000.00 Subcontract price), it had to submit any requests or claims for adjustment in the Subcontract price to Clark. *Id.*, Art. 9(b). Under the terms of the Subcontract, the manner and timing of Tusco's compensation for such work depended upon whether, on the one hand, the Government ordered the changes or, on the other hand, Clark independently ordered the changes. For changes "made by the Owner," Article 9(c) stated:

> Clark's receipt of payment from the Owner on account of pending changes made by the Owner shall be a condition precedent to Clark's obligation to make payment for changed work to Subcontractor.

*Id.*, Art. 9(c). For changes made by Clark autonomously, Article 9(d) directed:

> For changes ordered by Clark independent of the Owner of the Contract Documents, Subcontractor shall be entitled to equitable adjustment in the Subcontract price.

*Id.*, Art. 9(d).

Finally, in the event Clark and the Subcontractor disputed payment, the Subcontract contained several provisions governing settlement of these disputes. For disputes involving the Government, Article 11(b) of the Subcontract stated:

---

[4] Article 9(a) of the Subcontract stated, in part: "Clark may, at any time, unilaterally or by agreement with Subcontractor, without notice to the sureties, make changes in the work covered by this Subcontract. Any unilateral order . . . shall be in writing. Subcontractor shall perform the work as changed without delay." Compl., Ex. B, Art. 9(a).

> In any case of any dispute between Clark and the Subcontractor, in any way relating to or arising from any act or mission of the Owner or involving the Contract Documents, Subcontractor agrees to be bound to Clark to the same extent that Clark is bound to the Owner, by the terms of the Contract Documents, and by any and all preliminary and final decisions or determinations made thereunder by the party . . . whether or not Subcontractor is a party to such proceedings. In case of such dispute, Subcontractor will comply with all provisions of the Contract Documents allowing a reasonable time for Clark to analyze and forward to the Owner any required communications or documentation. Clark will, at its option, (1) present to the Owner, in Clark's name, or (2) authorize Subcontractor to present to the Owner, in Clark's name, all of Subcontractor's claims and answer the Owner's claims involving Subcontractor's work, whenever Clark is permitted to do so by the terms of the Contract Documents. . . . The Subcontractor price shall be adjusted by Subcontractor's allocable share determined in accordance with Article 9, hereof.

*Id.*, Art. 11(b).

### B. *Tusco's Work on the Project*

Tusco alleges that it performed all the work it agreed to perform under the original scope of the Project, which it says was authorized and accepted by Clark. Compl. ¶¶ 11, 13. During the course of the Project, however, Tusco says that Clark requested additional work from Tusco.[5] Tusco further alleges that it submitted change orders and performed the additional work, which Clark accepted. *Id.* ¶ 11.

Tusco's last day of work on the Project was on or about August 18, 2014. *Id.* ¶ 12. Although Clark has paid Tusco for the work performed under the original scope of the Project,[6] Tusco avers that Clark has not, to date, paid Tusco the amount it claims it is owed for the change-order work and extra work authorized by Clark, a total of $100,852.69. *Id.* ¶ 14.

---

[5] Tusco does not provide the details of the change order work in the Complaint, nor did parties' counsel elaborate on this topic during the March 29, 2016 Motions Hearing.

[6] Although not alleged in the Complaint, counsel for Tusco represented at the March 29, 2016 Motions Hearing that Tusco has been paid approximately $615,000.00 for the work originally contemplated by the Subcontract.

Soon thereafter, Tusco submitted a claim to Travelers for payment. *Id.* ¶ 15. Although Travelers did not deny the claim, it has failed to provide Tusco with a substantive response or pay it the $100,852.69 Tusco says it is owed. *Id.* ¶ 16.

### C. The Complaint

On March 24, 2015, Tusco, Clark, Travelers, Fidelity and Deposit Company of Maryland, and Federal Insurance Company entered into a tolling agreement under which the statute of limitations on all claims "arising from or in any way connected with the construction of the ICC-B North Campus Project" would be tolled from March 15, 2015, until September 24, 2015. *Id.* ¶ 17.

On September 23, 2015, Tusco filed its Complaint in this Court, alleging on the basis of the above facts: breach of contract against Clark (Count I), quantum meruit against Clark (Count II), and breach of payment bond and violation of the Miller Act against Travelers (Count III). *See id.* Clark has moved to dismiss Counts I and II for failure to state a claim upon which relief may be granted. Defs.' Mot. Dismiss and Stay, ECF No. 7. Travelers has answered the Complaint, but has moved to stay litigation of Count III. *Id.*; Answer, ECF No. 8. Clark joins in Travelers' Motion to Stay, to the extent its claims are not dismissed for failure to state a claim. Defs.' Mot. Dismiss and Stay.

## II. MOTION TO DISMISS COUNTS I AND II

### A. Legal Standards

Federal Rule of Civil Procedure 8(a) prescribes "liberal pleading standards," requiring only that a plaintiff submit a "short and plain statement of the claim showing that [he or she] is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (citing Fed. R. Civ. P. 8(a)(2)). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must

plead facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). But this standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court will accept factual allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The Court addresses Clark's arguments to dismiss the first two Counts of the Complaint.

**B.  *Count I: Breach of Contract Claim***

Tusco claims in Count I that Clark breached its obligations under the Subcontract when it "failed and refused to pay Tusco in full for labor, services and materials provided by Tusco in performing its scope of work under the Subcontract and pursuant to Clark's direction." Compl. ¶ 20.

In moving to dismiss this claim, Clark points to Article 9(c) of the Subcontract, in which Tusco expressly agreed that receipt of payment by the Government to Clark for change-order work would be a "condition precedent" to Clark's obligation to pay Tusco. Defs.' Mot. Dismiss and Stay, Mem. Supp. 6-7, ECF No. 7-1.[7] Clark argues that Tusco does not – and, as a matter of law, cannot – allege satisfaction of this condition precedent because Clark has not been paid by the Government for the additional work at issue. *Id.* In response, Tusco contends that Clark's argument amounts to an affirmative defense which is inappropriate at the motion to dismiss stage. Plfs.' Resp. Opp'n 4-5, ECF No. 12. Tusco also cites Article 9(c) of the Subcontract, governing payment for change orders made by Clark that were independent of the Government.

---

[7] Notably, Article 4(j) of the Subcontract contains a similar provision conditioning payment to Tusco on payment by the Government, or "Owner." However, this clause applies to payment of the $615,000.00 Subcontract price. *See* Compl., Ex. B, Art. 4(j). As counsel for Tusco has represented, Tusco has already been paid this amount by Clark. Article 4(j) therefore does not appear to have any bearing on this dispute over payment for change-order work, which is governed by Article 9's provisions.

Tusco asserts that it need not allege a condition precedent for change order work under that provision, and therefore its breach of contract claim is viable. *Id*. 3-4.

The Court agrees with Tusco.

Clark relies principally on Article 9(c) of the Subcontract which makes payment by the Government to Clark a condition precedent to payment by Clark to Tusco for work per change orders:

> Clark's *receipt of payment from the Owner* on account of pending changes made by the Owner shall be a *condition precedent* to Clark's obligation to *make payment for changed work to Subcontractor.*

Compl., Ex. B, Art. 9(c) (emphasis added). This type of conditional payment clause in a subcontract agreement is commonly referred to by courts as a "pay-if-paid" or "pay-when-paid" clause. *See, e.g.*, *Universal Concrete Products v. Turner Const. Co.*, 595 F.3d 527, 529-32 (4th Cir. 2010) (noting that a clause making payment by the Owner an "express condition precedent" to payment from the prime contractor to subcontractor is a "pay-when-paid" clause under Virginia law); *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1261-64 (10th Cir. 2006) (holding that a provision making "all payments to Subcontractor by Contractor . . . expressly contingent upon . . . payment for the Work by Contractor from Owner" is a "pay-if-paid" clause under Texas law); *see also* Steven J. Koprince, *The Slow Erosion of Suretyship Principles: An Uncertain Future for "Pay-When-Paid" and "Pay-If-Paid" Clauses in Public Construction Subcontracts*, 38 Pub. Cont. L.J. 47, 53–54 (2008).[8] In general, these types of

---

[8] Both "pay-when-paid" and "pay-if-paid" clauses condition payment to the subcontractor on receipt of payment by the owner. Notably, however, the two clauses are conceptually distinct. A "pay-when-paid" clause makes payment by the owner a "timing mechanism" of payment to the subcontractor. *MidAmerica Constr.*, 436 F.3d at 1261. This type of provision generally "provides that payments by the general contractor to the subcontractor are not due until the owner pays the general contractor for the work performed by the subcontractor." Koprince, *supra*, at 54. A "pay-if-paid" clause, on the other hand, makes payment by the owner an "express condition precedent" in "clear and unequivocal language." *MidAmerica Constr.*, 436 F.3d at 1262. This type of contract term "transfers the risk of the owner's

clauses are "used by general contractors to condition payment to their subcontractors upon the general contractor's receipt of payment from the owner." *Id.*; *see also MidAmerica Constr.*, 436 F.3d at 1261-62 (discussion both "pay-when-paid" and "pay-if-paid" clauses).

In Maryland,[9] such clauses in subcontracts are generally enforceable, at least in the context of private construction projects. *Gilbane Bldg. Co. v. Brisk Waterproofing Co., Inc.*, 585 A.2d 248, 551-52 (Md. App. 1991) (holding that a clause making payment by the owner an express condition precedent to payment by the general contractor to the subcontractor was enforceable); *see also* Koprince, *supra*, at 54, 79 (discussing the general rule that, "faced with an unambiguous pay-if-paid clause, most courts—but not all—will permit the general contractor to enforce the clause"). Assuming (without deciding) that Article 9(c) would be enforceable by a prime contractor in the context of a *federal public* construction project,[10] the Court nevertheless rejects Clark's attempt to dismiss Count I for two reasons.

---

nonpayment to the subcontractor by providing that the subcontractor will be paid if, and only if, the owner pays the general contractor for the subcontractor's work." Koprince, *supra*, at 54. Article 9(c) in the Subcontract appears to fall within the latter category, given its clear and unequivocal use of the term "condition precedent" to describe payment by the Owner. Yet regardless of the classification of Article 9(c), the finer distinctions between "pay-if-paid" and "pay-when-paid" clauses do not bear on the Court's disposition of Clark's Motion to Dismiss, as explained in this Part, *infra*.

[9] Count I is alleged as a state law breach of contract claim. The parties appear to agree that Maryland law applies to Tusco's state law claims. *See* Defs.' Mot. Dismiss and Stay, Mem. Supp. 7 (citing Maryland cases in reference to Tusco's quantum meruit claim); Plfs.' Resp. Opp'n 7 n.1 (noting that Maryland law applies to interpretation of the Subcontract). Moreover, Article 22(d) of the Subcontract provides: "Unless otherwise provided in the Contract Documents, the terms and conditions of this Subcontract shall be interpreted in accordance with the laws of the jurisdiction where the Project is located." Compl., Ex. B, Art. 22(d). The Project at issue in this case was located in Bethesda, Maryland. Compl. ¶ 7. In Maryland, choice of law provisions in contracts are enforceable unless the choice of law jurisdiction has no substantial relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest in the parties or the transaction. *See Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803-05 (Md. 2011); Restatement (Second) of Conflict of Laws § 187 (1971). Here, Maryland law would govern state law claims arising out of the Subcontract because: (1) Maryland has a substantial relationship to the transaction, and (2) there is no indication that any other state has a greater interest in the transaction than Maryland. *See id.*

[10] This case involves a federal construction project and a separate claim for payment against Clark's surety under the Miller Act (Count III). The Miller Act applies to suits on payments bonds and therefore provides a right of action to claims against *sureties*. *See* 40 U.S.C. § 3133(b)(1). As will be discussed in

*First,* at this stage of the litigation, sufficient facts have not been developed to determine whether Article 9(c)'s condition precedent has or has not been satisfied. In a contract dispute, plaintiffs are not required to expressly plead satisfaction of a condition precedent to allege a breach of contract claim—an allegation is sufficient if it alleges that the claimant "has at all times performed all its proper and legitimate duties and obligations under its contract." *Howard Robson, Inc. v. Town of Rising Sun*, CIV.A. ELH-14-2003, 2015 WL 424773, at *12 (D. Md. Jan. 30, 2015) (quoting 2 Moore's Federal Practice, § 9.04[1] (3d ed. 1997)). Instead, failure to satisfy a condition precedent is ordinarily considered an affirmative defense. *See Howard*, 2015 WL 424773, at *12-13; *Nat'l Labor Coll., Inc. v. Hillier Grp Architecture N.J., Inc.*, CIV.A. No. DKC 09-1954, 2012 WL 3264959, at *6 (D. Md. Aug. 9, 2012). An affirmative defense is usually not appropriate at the motion to dismiss stage unless the facts necessary to establish it are available on the face of the pleadings. *See Cezair v. JPMorgan Chase Bank, N.A.*, CIV.A. DKC-13-2928, 2014 WL 4295048, at *3 (D. Md. Aug. 29, 2014) (citing *Alexander v. City of Greensboro*, 801 F. Supp. 2d 429, 445 (M.D.N.C. 2011) ("[A]n affirmative defense . . . may only be reached at the [motion to dismiss] stage if the facts necessary to deciding the issue clearly appear on the face of the pleadings.")). Courts in this jurisdiction have therefore rejected

Part III, *infra*, sureties generally cannot enforce conditional payment clauses in a subcontract because such clauses abrogate subcontractors' rights under the Miller Act. At least one court has expressly held that the Miller Act would also preclude enforcement of conditional payment clauses by *general contractors*, not just sureties. *See U.S. for Use of Ackerman v. Holloway Co.*, 126 F. Supp. 347, 348 (D.N.M. 1954). The rulings of other courts are less clear with respect to this issue. *See, e.g.*, *U.S. for Use & Benefit of Walton Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1205-08 (9th Cir. 2002); *U.S. for Use of DDC Interiors, Inc. v. Dawson Const. Co.*, 895 F. Supp. 270, 273 (D. Colo. 1995), *aff'd*, 82 F.3d 427 (10th Cir. 1996). The unusual result of allowing the general contractor but not the surety to enforce a conditional payment clause may be a distinction without a difference, given that general contractors are usually named as intervening parties in Miller Act suits and must ordinarily indemnify their respective sureties if they have been found liable on a payment bond. *See U.S. ex rel. MPA Const. v. XL Specialty Ins. Co.*, 349 F. Supp. 2d 934, 937 (D. Md. 2004) (citing cases in which principals have intervened as of right in suits by subcontractors on payment bonds). Ultimately, as other grounds merit dismissal of Clark's motion, the Court will decline to issue a definitive ruling on whether Article 9(c) is unenforceable by Clark as a matter of law due to the Project's federal nature. Nevertheless, the parties are encouraged to explore this issue, if appropriate, as the case proceeds.

defendants' premature attempts to dismiss a lawsuit based on the presence of conditions precedent clauses when crucial facts have not yet been developed. *Howard Robson*, 2015 WL 424773, at *12-13; *Hillier*, 2012 WL 3264959, at *6.

With respect to the change-order work at issue, Tusco pleads that it was Clark that "requested additional work be performed" and that Clark did not pay Tusco for that additional work. Compl. ¶¶ 11, 14. Tusco states that it has performed all of its obligations under the Subcontract. *Id.* ¶ 19. Although Tusco does not allege that Clark has been paid by the Government for the change order work, Tusco does not have an obligation to do so: Tusco's claim is sufficient if the subcontractor alleges that it "has at all times performed all its proper and legitimate duties and obligations under its contract," *Howard Robson*, 2015 WL 424773, at *12, which Tusco does here. Tusco therefore plausibly states a claim without expressly pleading that Article 9(c)'s condition precedent has been satisfied.[11]

*Second*, even if it were clear on the face of the pleadings that Article 9(c)'s condition precedent has not been satisfied, Tusco could still plausibly recover under other provisions of the Subcontract. Clark's argument assumes that the *Government* ultimately directed the change order work which Tusco performed. However, as Tusco points out, Clark could very well have ordered the additional work independently of the Government. If that is indeed the case, Clark's payment obligations would be governed by Article 9(d) of the Subcontract, which does not contain the same condition precedent clause as Article 9(c). Article 9(d) says simply that: "For changes ordered by Clark independent of the Owner or the Contract documents, Subcontractor *shall be entitled to equitable adjustment* in the Subcontract price." Compl., Ex. B, Art. 9(d) (emphasis

---

[11] As noted by Tusco's counsel at the Motions Hearing, Clark's Motion effectively asks Tusco to do the impossible: allege facts about which the subcontractor has no knowledge or awareness. Tusco is not in a position to have alleged satisfaction of Article 9(c)'s condition precedent, because Tusco has not been privy to any communications between the Government and Clark, let alone given notice of the status of any Government payments to Clark for change order work.

added). Tusco's allegations plausibly state a claim for the monetary equivalent of an equitable adjustment under Article 9(d).

In response, Clark contends that the Government ordered the additional work and therefore Article 9(c), not Article 9(d), applies. Clark states that it has "submitted a Request for Equitable Adjustment ("REA"), seeking an adjustment of the contract time and contract sum and included costs incurred by Tusco," but that, "[t]o date, the owner has not accepted or rejected the REA." Defs.' Mot. Dismiss and Stay, Mem. Supp. 1-2. As an Exhibit to its Motion, Clark attaches a June 2015 letter from Clark to Travelers apparently discussing the change orders at issue. Defs.' Mot. Dismiss and Stay, Ex. 1, ECF No. 7-2. This letter purports to "prove" that the Government was the source of the change orders, and that Clark has not yet been paid by the Government for these change orders. *See id.*

The Court is not disposed to grant Clark's Motion based on these contentions and this single exhibit. The veracity *vel non* of Clark's assertions is not properly before the Court at this juncture. At the motion to dismiss stage, a court must accept all factual allegations in the *complaint* (and exhibits attached to the complaint, if any, *see* Fed. R. Civ. P. 10(c)) as true; a court does not ordinarily accept as true, much less as dispositive, the factual contentions a defendant makes in response. *See Twombly*, 550 U.S. at 555. Clark is asking the Court to find, prior to any discovery, and as a matter of law, that the Government was the source of the change orders. Clark's two-page letter clearly does not prove (1) that the Government actually directed the change orders, or (2) that Clark has not yet been paid by the Government for the change order work. *See* Defs.' Mot. Dismiss and Stay, Ex. 1.

For these reasons, Clark's Motion to Dismiss Count I is denied without prejudice.

### C. Count II: Quantum Meruit Claim

In Count II, Tusco seeks to recover against Clark based on quantum meruit, stating that it "provided valuable labor, services, and materials that were necessary for Clark to perform and complete its obligations under the Prime Contract," that Clark "acknowledged" and "accept[ed]" the work, but that Clark "failed and refused to pay Tusco" and "has been unjustly enriched." Compl. ¶¶ 23-27. Clark moves to dismiss this Count, arguing that quantum meruit is not a legally permissible claim when a contract governs the dispute at issue. Defs.' Mot. Dismiss and Stay, Mem. Supp. 7-8. Tusco responds that quantum meruit is merely an alternative theory of recovery, and it argues that it should not be barred from pleading this theory at this point in the litigation. Plfs.' Resp. Opp'n 6-7.

"By its terms, quantum meruit is a method of obtaining a reasonable value for services, absent a clear and understood contract or, for example, for partial performance when an entire contract has been rescinded." *Attorney Grievance Comm'n of Maryland v. McIntire*, 405 A.2d 273, 277 (Md. 1979); *see also* QUANTUM MERUIT, Black's Law Dictionary (10th ed. 2014) (defining quantum meruit in part as "[t]he reasonable value of services; damages awarded in an amount considered reasonable to compensate a person who has rendered services in a quasi-contractual relationship"). In Maryland,[12] "generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists." *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000). "The reason for the rule is simple—parties who have entered into express contractual agreements assume certain risks, and they should not be able to avoid bearing those risks by seeking quasi-contractual remedies." *MHD-Rockland Inc. v. Aerospace*

---

[12] *See* text accompanying note 9, *supra*.

*Distributors Inc.*, No. CIV. CCB-13-2442, 2014 WL 31677, at *5 (D. Md. Jan. 3, 2014) (citing *J. Roland Dashiell & Sons*, 747 A.2d at 607).

On the other hand, "[p]arties may plead alternative theories of liability, indeed as many theories as the facts will fit." *Swedish Civil Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002) (internal citations and quotations omitted). In its response to Clark's motion, Tusco says that the relationship of the Subcontract to the change order work it performed is currently in dispute. If Tusco ultimately shows that it performed the change order work, but did so outside the scope of the Subcontract, a quantum meruit theory of recovery would potentially lie. Clark's Motion to Dismiss Count II will therefore be denied without prejudice.

### III. MOTION TO STAY

#### A.  *Legal Standards*

"Whether to stay a case is a decision made in the exercise of discretion by the district court as part of its inherent power to control its own docket." *Elite Const. Team, Inc. v. Wal-Mart Stores, Inc.*, No. CIV. JKB-14-2358, 2015 WL 925927, at *3 (D. Md. Mar. 2, 2015) (citing *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)). The party moving to stay "must demonstrate a pressing need for one" and must show "that the need for a stay outweighs any possible harm to the nonmovant." *Elite Const.*, 2015 WL 925927, at *3 (internal quotations and citations omitted).

When considering a motion to stay, the court takes into consideration "[e]conomy of time and effort for the court, counsel, and litigants" and weighs "competing interests" to "maintain an even balance." *Id.* (citing *Landis*, 299 U.S. at 254-55). In particular, the court should weigh the following factors in evaluating a motion to stay: "(1) the interests of judicial economy; (2)

hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *Elite Constr.*, 2015 WL 925927, at *3 (quoting *Davis v. Biomet Orthopedics, LLC*, No. CIV. JKB-12-3738, 2013 WL 682906 (D. Md. Feb. 22, 2013)).

Travelers' asks the Court to stay Count III, Tusco's Miller Act claim. The Court declines to do so.

The Court begins with an overview of the Miller Act and applicable case law.[13]

**B.  The Miller Act**

The Miller Act (or "the Act") requires a general contractor on a federal construction project to furnish a payment bond "for the protection of all persons supplying labor and material in the prosecution of work provided for in [the] contract." 40 U.S.C. § 3131(b)(2). The Act is designed to achieve certain policy objectives. As the Supreme Court has stated:

> The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings. The essence of its policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material. Thus the Act provides a broad but not unlimited protection.

*U.S. for Benefit & on Behalf of Sherman v. Carter*, 353 U.S. 210, 216-17 (1957).

To achieve its purpose, the Act creates a cause of action in favor of "[e]very person who has furnished labor or material in carrying out work provided for in [the] contract." 40 U.S.C. § 3133(b). Persons "who [have] not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished . . . the material . . . may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought." *Id*. As the Ninth Circuit has explained, "by the express terms of the Miller Act a subcontractor's right of

---

[13] Federal law, not state statute or common law principles, controls in Miller Act suits. *F.D. Rich Co., Inc. v. United States ex rel. Indust. Lumber Co., Inc.*, 417 U.S. 116, 127 (1974) ("The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law.").

recovery on a Miller Act payment bond is conditioned on the passage of time from completion of work or provision of materials." *U.S. for Use and Benefit of Walton Tech., Inc. v. Webstar Engineering, Inc.*, 290 F.3d 1199, 1205 (9th Cir. 2002).

As a result of this unambiguous language, federal courts have enforced the right of subcontractors to collect on payment bonds after they have completed their work on a federal project, especially in the face of attempts by sureties to delay litigation. A principal context in which this has arisen is in connection with conditional payment clauses (or "pay-if-paid" and "pay-when-paid" clauses) in subcontracts.[14] As discussed earlier, these contract clauses generally condition payment by the prime contractor to the subcontractor on receipt of payment to the prime contractor by the owner. *See MidAmerica Constr.*, 436 F.3d at 1261-62.

When a surety attempts to enforce its principal's (the prime contractor's) conditional payment clause, federal courts that have addressed the issue have unanimously held that a surety is *not* entitled to the benefits of its principal's pay-when-paid or pay-if-paid clause. *See e.g., Walton Tech.*, 290 F.3d 1199; *U.S. for Use & Benefit of T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire Ins. Co. of Texas*, 942 F.2d 946 (5th Cir. 1991); *U.S. ex rel. Straightline Corp. v. Am. Cas. Co. of Reading, PA*, CIV.A. 5:06-00011, 2007 WL 2050323 (N.D. W. Va. July 12, 2007); *U.S. for Use of DDC Interiors, Inc. v. Dawson Const. Co.*, 895 F. Supp. 270 (D. Colo. 1995); *U.S. ex rel. Ackerman v. Holloway Co.*, 126 F. Supp. 347 (D.N.M. 1954); *see also* Koprince, *supra*, at 56-74 (providing an overview of the body of case law in this area).[15] This is so despite the fact that "the general rule of suretyship law" is that a "surety's liability is coextensive with that of its principal." *See Walton Tech.*, 290 F.3d at 1206-07. In Miller Act

---

[14] *See* text accompanying note 8, *supra*.

[15] Although not in the context of a Miller Act claim, the Fourth Circuit has held in the context of a private construction contract that allowing a surety to enforce a conditional payment clause "defeats the very purpose of a payment bond." *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 723 (4th Cir. 2000).

cases, the liability of sureties is "at least coextensive with the obligations imposed by the Act."

*Id.* at 1206.

Courts that have held conditional payment clauses unenforceable have emphasized the Miller Act's unambiguous right to sue after completion of a project and the passage of time. As the Ninth Circuit explained in *Walton Tech.*:

> A subcontractor's right of recovery on a Miller Act payment bond accrues ninety days after the subcontractor has completed its work, not "when and if" the prime contractor is paid by the government. Permitting a Miller Act surety to avoid liability on the payment bond based on an unsatisfied "pay when and if paid" clause in the subcontract would, for all practical purposes, prohibit a subcontractor from exercising its Miller Act rights until the prime contractor has been paid by the government. In cases where the government does not pay the prime contractor within the one year statute of limitations period, the subcontractor would be barred from asserting its Miller Act rights.

290 F.3d at 1208.

Consistent with this view, federal courts have also held that a surety may only enforce a conditional payment clause in the subcontract if there is a clear and explicit waiver of Miller Act rights in the subcontract. *Walton Tech.,* 290 F.3d at 1208-09 (noting that a waiver of Miller Act rights must be "clear and explicit"); *DDC Interiors*, 895 F. Supp. at 272 ("Right to sue under the Miller Act may be waived by clear and express provisions in the contract between the prime contractor and the subcontractor.") (citing *U.S. for Use of B's Co. v. Cleveland Elec. Co. of S.C.*, 373 F.2d 585, 588 (4th Cir. 1967)).

### C. *Travelers' Arguments*

Pursuant to the Miller Act, Tusco has sued Travelers for payment on the Bond, alleging in Count III that "Travelers is obligated, pursuant to the Bond, to pay Tusco for labor, materials, and services it provided in performing its scope of work under the Subcontract" and that "Travelers has failed to fulfill its obligation under the Bond." Compl. ¶¶ 29-30. Travelers argues for a stay of the Miller Act claim, pointing to Article 11(b) of the Subcontract, which sets forth

certain dispute resolution procedures as between Clark and Tusco "relating to or arising from any act or omission of the Owner or involving the Contract Documents." Defs.' Mot. Dismiss and Stay, Mem. Supp. 8-9 (quoting Compl., Ex. B., Art. 11(b)). Travelers asserts that Tusco is obligated to exhaust these same dispute resolution procedures, and submits that Tusco expressly agreed to a stay of any litigation pending exhaustion of these procedures. Defs.' Mot. Dismiss and Stay, Mem. Supp. 8-9. Travelers also claims that allowing Tusco to proceed would lead to inefficiency, duplication of effort, and possibly "anomalous results." *Id.* 10 (internal citations and quotations omitted). Travelers caps its argument by asserting that no harm will result from a stay. *Id.*

In response, Tusco contends that, to the extent that Article 11(b) (or any other provisions of the Subcontract) requires Tusco to wait for an indefinite period prior to suing on the Bond, such provisions are unenforceable because they contravene the purpose of the Miller Act. Plfs.' Resp. Opp'n 8-9. Obligating Tusco to wait until a final determination has been made under the Subcontract's dispute resolution procedure harms Tusco, not only because it trifles with Miller Act rights, *see id.*; it also fails to acknowledge that Tusco has already been waiting almost two years to be paid for the change order work.[16]

Tusco is right.

In arguing for a stay, Travelers suggests that, because its liability for payment of the bond is derivative of Clark's, and because Tusco agreed in Article 11(b) to "be bound to Clark to the same extent that Clark is bound to the Owner," the dispute resolution procedures set forth in Article 11(b) must or should be followed prior to the initiation of any claims against Travelers.

---

[16] Although the length of time Tusco has been waiting for payment was not expressly addressed in Tusco's opposition, Tusco's counsel emphasized this fact at the Motions Hearing.

Travelers' argument ignores established case law to the effect that "the principal's and the surety's liability are only coextensive to the extent permitted by the terms of the Miller Act." *United States, et al. v. Zurich Am. Ins. Co.*, 99 F. Supp. 3d 543, 550 (E.D. Pa. 2015) (citing *Sherman*, 353 U.S. at 216-17; *Walton*, 290 F.3d at 1206; *T.M.S. Mech. Contractors*, 942 F.2d at 951). Indeed, a federal court rejected this exact argument in the context of circumstances similar to those at bar.

*United States, et al. v. Zurich Am Ins. Co.* involved a payment dispute between a government contractor, Nason Construction, Inc. ("Nason"), its surety, Zurich American Insurance Company ("Zurich"), and a subcontractor, Marenalley Construction, LLC ("Marenally"), with respect to a construction project for the Veterans Administration ("VA"). 99 F. Supp. 3d at 545. Marenalley claimed that it was owed compensation for additional work performed on a project. *Id.* at 546. Nason was pursuing additional payment from the VA for those claims through a statutorily mandated administrative dispute resolution process set out in its contract with the VA. At the time of the lawsuit, the VA had not approved payment for the additional work. *Id.* Nason and Zurich argued that the action should be stayed until the completion of the dispute resolution process set forth in the prime contract between Nason and the VA, a provision which was incorporated by reference in the subcontract. *Id.* at 549. The prime contractor and surety reasoned that, because Zurich's liability was derivative of Nason's, and Nason's liability was being determined in the administrative proceeding, the court had to stay Marenalley's Miller Act claim against Zurich. *Id.* at 550. The court disagreed:

> The Miller Act entitles Marenalley to bring suit ninety days after the completion of its work on the Project . . . not when and if Nason recovers from the VA. Conditioning Marenalley's right to recover from the Payment Bond on the completion of Nason's [administrative dispute resolution process] would be inconsistent with the terms of the Miller Act.

*Id.* (internal citations omitted).

Nason and Zurich protested that they would be prejudiced in the absence of a stay due to the costs of dual litigation and the risk of inconsistent decisions, arguments similar to those made by Travelers (and Clark) in this matter. But the court in *Zurich Am.* was not "overly troubled by these arguments." *Id.* "Ordinarily the fact that a prime contractor has a claim for the same amount pending under a 'disputes clause' of the prime contract does not affect Miller Act cases." *Id.* (citing cases) (internal quotation marks omitted). Ultimately, because the administrative dispute resolution process involved only the prime contractor and the VA, and because the VA had "no jurisdiction" over the amount Nason must pay Marenalley and "no interest" in how that amount must be determined, the court ruled against imposing a stay. *Id.* at 551. The court concluded that "a stay would subject Marenalley to a substantial, indefinite delay as Nason's claim passes through the administrative process . . . only to be left at the end of that process to begin again here to litigate its rights against Nason." *Id.* at 551.

The Court agrees with the reasoning of *Zurich Am.*

The Miller Act gives a subcontractor the right to sue a payment bond's *surety* based "on the passage of time," not on the payment from the federal government to a prime contractor. *Walton*, 290 F.3d at 1205. Here, allowing Article 11(b) of the Subcontract to preclude Tusco's ability to sue Travelers until after Clark has completed its dispute resolution process with the Government – simply because this clause provides that "Subcontractor agrees to be bound to Clark to the same extent that Clark is bound to the Owner" – would contravene the rights afforded to subcontractors under the Miller Act. *See Walton*, 290 F.3d at 1208 ("A subcontractor's right of recovery on a Miller Act payment bond accrues ninety days after the subcontractor has completed its work, not 'when and if' the prime contractor is paid by the

government."); *T.M.S. Mech. Contractors*, 942 F.2d at 949 n. 6 ("[T]he 'pay-when-paid' clause in the Subcontract does not preclude TMS's recovery on its contract work and change order claim because under the Miller Act, the liability of the contractor is to the subcontractor, despite non-payment by the government to the contractor."); *Zurich Am.*, 99 F. Supp. 3d at 550 ("[A] subcontract term that conflicts with the Miller Act is ineffective in a suit against the surety on the payment bond.").[17]

The Court is not "overly troubled" by Travelers' arguments that allowing the litigation to proceed could lead to inconsistent decisions and duplicative, costly litigation. *See id.* There is no reason why a dispute resolution process between Clark and the Government should delay Tusco's ability to litigate its statutory entitlement to seek payment.[18] The risk of inconsistent results between that process and this litigation is a risk that the prime contractor must bear – transferring the risk of nonpayment for work performed from the subcontractor to the prime contractor is one of the purposes of the Miller Act. *See DDC Interiors*, 895 F. Supp. at 272 ("[T]he purpose of the payment bond required under the Miller Act is to 'shift the ultimate risk

---

[17] In support of its Motion, Travelers also points to Article 11(c) of the Subcontract, stating that this provision expressly requires a "stay." Article 11(c) provides that, "[t]o the extent not resolved under Article 11.b. above, any dispute between Clark and Subcontractor shall, at Clark's sole option, be decided by arbitration. . . . If Clark notifies Subcontractor that Clark contends any arbitration or lawsuit brought under this Article 11.c. involves a controversy within the scope of Article 11.b., the dispute process shall be *stayed* until the procedures under Article 11.b. are completed." Compl., Ex. B, Art. 11(c) (emphasis added). The "stay" referred to Article 11(c) is therefore a stay of arbitration or litigation pending any dispute resolution process under Article 11(b). To the extent Article 11(c) is cited to "stay" this litigation and thus Tusco's ability to exercise its Miller Act rights, Article 11(c) is also unenforceable, for the reasons set forth in this part, *infra*. As a separate matter, the arbitration provision in this clause does not affect the current dispute because (i) Defendants' position is that the change-orders are Owner-related and therefore should be resolved under 11(b), *see* Defs.' Mot. Dismiss and Stay, Mem. Supp. 9 ("[I]t cannot be disputed that Tusco's claims in this litigation are related to the Owner."), and (ii) in any event, Clark has not elected to arbitrate.

[18] At the Motions Hearing, counsel for Defendants suggested that the Subcontract can "overcome" Tusco's rights under the Miller Act. That is incorrect as a matter of law. As noted, a provision of a subcontract which impedes Miller Act rights can only be enforced if there is an express waiver of Miller Act rights in the agreement. *See Zurich Am.*, 99 F. Supp. 3d at 550 ("[A] subcontract term that conflicts with the Miller Act is ineffective in a suit against the surety on the payment bond."); *see also* text accompanying note 20, *infra*.

of nonpayment from workmen and suppliers to the surety.'") (quoting *Am. Sur. Co. of New York v. Hinds*, 260 F.2d 366, 368 (10th Cir. 1958)).

Far more troubling to the Court, quite frankly, is the potential effect of a lengthy dispute resolution process on Tusco's right to reimbursement for the change order work.

As Clark has represented, this dispute resolution process currently involves only the Government and Clark, and neither of these parties has an economic interest in how much Tusco is ultimately reimbursed for the change order work. *See id.* at 551 (noting that the VA has "no interest in how that amount [paid to Nason, the subcontractor] is determined" in declining to stay litigation pending an administrative dispute resolution process). This arrangement is especially troubling given the possibility of a settlement between the two entities. If, for example, the Government agrees to pay Clark *less* than the total amount claimed by Tusco for the change order work, there is no provision in the Subcontract that obligates Clark to negotiate favorable terms for Tusco, nor does the Government have any particular interest in the amount of Tusco's ultimate payments. In the event of a settlement which, hypothetically, leaves Tusco with fifty, twenty-five, or even zero percent of what it claims it is owed, Tusco may be able to contest this result against Clark in some forum, but must it wait an indefinite amount of time (until the dispute resolution process is complete) to do so?[19]

---

[19] The Court asked Defendants' counsel about these hypothetical scenarios at the Motions Hearing. Counsel could not provide the Court with a satisfactory answer about Tusco's rights in the event of a settlement between the Government and Clark which significantly decreased the subcontractor's claim to recovery. Ultimately, Defendants' counsel conceded that Tusco would be left having to sue Clark in the event that Tusco was paid zero percent of its claimed amount for the change order work.

It has been nearly two years since Tusco completed work on the project. As a matter of fairness, the Court finds it concerning that the subcontractor might be forced to wait months or even years to get paid for its work. Tusco has not waived its Miller Act rights.[20]

Travelers' Motion to Stay is therefore denied without prejudice.[21]

## IV. CONCLUSION

For the foregoing reasons, Clark's Motion to Dismiss and Defendants' Motion to Stay (ECF No. 7) are **DENIED WITHOUT PREJUDICE**, as set forth in the accompanying Order.

_/s/_
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**August 15, 2016**

---

[20] Defendants do not argue that Article 11(b) (in setting forth dispute resolution procedures which could delay payment to the subcontractor) effectively waives Tusco's Miller Act rights to seek payment on the Bond. Even if Defendants had raised this argument, the Court would reject it. Waivers of Miller Act rights must be "clear" and "explicit." _Walton Tech.,_ 290 F.3d at 1208; _DDC Interiors_, 895 F. Supp. at 272. Article 11(b) does not make any express reference to Tusco's rights under the Miller Act, nor does any other provision in the Subcontract. _See DDC Interiors_, 895 F. Supp. at 274 ("At a minimum, an effective waiver of Miller Act rights must include mention of the Miller Act and unambiguously express intention to waive the rights provided by it. No such language is found in the contract documents before me.").

[21] Without providing additional argument, Clark joins in Travelers' Motion to Stay. The Court will assume that Clark's reasons for seeking a stay with respect to Counts I and II are the same as Travelers' reasons for staying Count III. The Court sees no cause to stay discovery on Tusco's breach of contract and quantum meruit claims against Clark, given the extensive amount of time Tusco has already been forced to wait to litigate these claims. Furthermore, allowing the case to proceed against the surety on Count III, which involves the same issues of fact present in Counts I and II, will not necessarily decrease costs and increase efficiency—instead, allowing the case to proceed against both Defendants at the same time could lead to a more efficient administration of the issues in dispute. Finally, any stay of Tusco's lawsuit could impede its Miller Act rights, as explained at length in this Part. The Court therefore also **DENIES** Clark's (Alternative) Motion to Stay.